IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:12-cr-00021-002 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WILLIAM R. WHYTE, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

This matter is before the Court of Defendant William Whyte's Motion to Dismiss the Indictment. Defendant Whyte filed his Motion on October 20, 2016 [ECF No. 21]. The United States responded on November 17 [ECF No. 40], and Whyte replied on November 29 [ECF No. 44]. I heard oral arguments on the Motion on December 1. The matter is now ripe for disposition. For the reasons stated herein, I will deny Defendant Whyte's Motion to Dismiss.

I. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

Defendant William R. Whyte ("Whyte"), along with Defendant Armet Armored Vehicles, Inc. ("Armet"), was indicted on July 19, 2012, with three counts of major fraud against the United States, in violation of 18 U.S.C. § 1031; six counts of wire fraud, in violation of 18 U.S.C. § 1343; and three counts of false, fictitious, and fraudulent claims, in violation of 18 U.S.C. § 287. (See generally Indictment ¶¶ 28–47 [ECF No. 1].)

Armet is a business "that manufactures and supplies armored vehicles for government and commercial customers." (Id. ¶ 1.) Whyte is Armet's owner and CEO, and he personally manages and supervises all of the operations at Armet. (Id. ¶ 2.) The Indictment stems from contracts Armet secured to provide the government with armored vehicles for use in Iraq. Contract 0028 concerned 24 armored gun trucks for a total sales price of $4,779,693.36 (id. ¶ 6); contract 0047 concerned eight additional armored gun trucks for an additional $1,593,231.10 (id.

¶ 90). Both contracts specified that each armored gun truck have armor protection of a standard "at which armor-piercing bullets of a given caliber and velocity [would] not penetrate the armor." (Id. ¶ 11.) Further, "the undercarriage of each armored gun truck [was to] have armored mine plating protection and . . . '[a]t a minimum, the protection level acceptable shall withstand blast underneath the vehicle from grenades and/or blasts of whatever nature equivalent to the strength of two DM51 German ordinance.'" (Id. ¶ 12.)

After being awarded the contracts, the government contends that Armet failed to deliver any vehicles by the delivery date. (Id. ¶ 14). The government also maintains that, when delivered, the vehicles failed to meet the contract specifications with regard to the armor protection. (Id. ¶ 21–22.) The government asserts that Armet's invoices and request for a progress payment were "false and fraudulent because the armored gun trucks that [it] shipped did not comply with the ballistic and blast protection requirements of the Contracts and did not have run-flat tires." (Id. ¶ 25.)

On October 16, 2012, Frank Skinner ("Skinner"), Armet's former President, filed a *qui tam* action against Whyte and Armet alleging violations of the Federal False Claims Act, 31 U.S.C. § 3732. The government chose not to exercise its right to intervene in the civil case. See 31 U.S.C. § 3730(c)(2)–(3). Skinner's Complaint alleged twenty-five separate counts of fraud or fraud-related activities arising from the 0028 and 0047 contracts. At trial, the jury returned a verdict for Whyte and Armet on all counts, finding that neither Whyte nor Armet "knowingly presented, or caused to be presented, false or fraudulent claims for payment for . . . armored vehicles that it fabricated." (Jury Verdict, U.S. ex rel. Skinner v. Armet Armored Vehicles, Inc., and William R. Whyte, 4:12-cv-45, June 4, 2015 [ECF No. 166].)

Whyte was eventually extradited to the United States on or about September 23, 2016.[1] On October 20, 2016, Whyte filed the present Motion to Dismiss the Indictment, alleging that collateral estoppel barred all charges against him. At its core, Whyte alleges that the civil jury's verdict in U.S. ex rel. Skinner v. Armet conclusively established that no fraud was committed, and thus the ultimate question underlying the criminal charges has been fully prosecuted by the government. As such, he contends the criminal case must be dismissed. He also contends that several counts of the Indictment are barred by the applicable statute of limitations.

## II.  STANDARD OF REVIEW

"[C]ollateral estoppel insures that 'when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be relitigated between the same parties in any future lawsuit.'" United States v. McClung, No. Crim. A. 97-0031-II, 1997 WL 671602, at *1 (W.D. Va. Sept. 23, 1997) (quoting Ashe v. Swinson, 397 U.S. 436, 443 (1970)).

> An indictment that involves essential elements of facts and law which have been tried and decided in an earlier case should be dismissed. Ashe v. Swenson, 397 U.S. 436 (1970); Brown v. Ohio, 432 U.S. 161 (1977). In ruling on such a motion, the court must determine exactly what was decided at the earlier trial. United States v. Davis, 369 F.2d 775, 777 (4th Cir. 1966), cert. denied, 386 U.S. 909 (1967). It is the burden of the moving party to demonstrate that the issue they urge is foreclosed logically constituted the basis of the earlier jury verdict. Id. "Only those issues necessarily determined by the first jury are conclusive in a second trial." Id. However, "the inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" United States v. Davis, 460 F.2d 792, 796 (4th Cir. 1972) (quoting Ashe, 397 U.S. at 444).

United States v. Computer Sciences Corp., 511 F. Supp. 1125, 1137 (E.D. Va. 1981).

---

[1] Whyte had fled to Canada to avoid prosecution. The civil case against him and Armet was prosecuted in his absence.

"A defendant may, at any time before trial, raise a motion alleging a defect in the indictment, including its failure to comport with the applicable statute of limitations." United States v. Magainik, 160 F. Supp. 3d 909, 913–14 (W.D. Va. 2015); Fed. R. Crim. P. 12(b)(3). Upon consideration of such a motion, the government's allegations are presumed to be true, and the indictment is regarded "in a 'practical,' rather than 'purely technical,' manner." Id. (citing United States v. Matzkin, 14 F.3d 1014, 1019 (4th Cir. 1994). The defendant is entitled to dismissal if he shows that the indictment's allegations, "even if true, would not state an offense." United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004).

## III. DISCUSSION

### A. COLLATERAL ESTOPPEL

Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be relitigated between the same parties in any future lawsuit." Ashe v. Swinson, 397 U.S. 436, 443 (1970).

> To determine whether the issue should be precluded, the court must decide (1) whether the issue in question is identical to the previous issue, (2) whether it was actually determined in the prior adjudication, (3) whether it was necessarily decided in that proceeding, (4) whether the resulting judgment settling the issue was final and valid, and (5) whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding. In order for the determination of an issue to be given preclusive effect, it must have been necessary to a judgment.

United States v. Fiel, 35 F.3d 997, 1006 (4th Cir. 1994) (citing United States v. Nash, 447 F.2d 1382, 1385 (4th Cir. 1971)).

Turning to the fifth Fiel factor, "[t]he persons bound by the prior factual finding include the actual parties of the prior proceeding. Courts have also extended the preclusion to non-parties where there is such a degree of affinity of interests of the person who was not a formal

- 4 -

Case 4:12-cr-00021-JLK Document 53 Filed 12/14/16 Page 4 of 13 Pageid#: 566

party to the prior proceeding, as to render the doctrine of collateral estoppel applicable." In re Goldschein, 241 B.R. 370, 374 (D. Md. 1999) (citing Va. Hosp. Assoc. v. Baliles, 830 F.2d 1308, 1312 (4th Cir. 1967)). "Participation and control of the prior litigation by the party to be bound is necessary to the application of collateral estoppel to a non-formal party." Id. at 374–75.

> The question is essentially a matter of fact, to be determined by looking for that measure of 'practical control' that makes it fair to impose preclusion. Preclusion is fair so long as the relationship between the non-party and the party was such that the non-party had the same practical opportunity to control the course of the proceedings that would be available to a party.

Id. (quoting Charles A. Wright, et al., Federal Practice and Procedure § 4451 (1981)).

A "party" is defined as "[o]ne by or whom a lawsuit is brought." Party, BLACK'S LAW DICTIONARY (8th ed. 2004). Under the False Claims Act, if the government chooses not to proceed with the action, the relator "shall have the right to conduct the action." 31 U.S.C § 3730(c)(3) (2010). The government remains "the real party in interest in a *qui tam* action under the False Claims Act even if it is not controlling the litigation." United States ex rel. Walker v. R&F Properties of Lack County, Inc. 433 F.3d 1349, 1359 (11th Cir. 2005); see also Fed. R. Civ. P. 17(a). A "party in interest" is "[a] person entitled under the substantive law to enforce the right sued upon and who generally, but not necessarily, benefits from the action's final outcome." Real party in interest, BLACK'S LAW DICTIONARY (8th ed. 2004).

In a False Claims Act in which the government does not elect to intervene—such as Skinner's FCA action—the government is not a "party," although it remains a "party in interest." While the Federal Rules of Civil Procedure require that the action be brought in the name of the government, the relevant statute strips the government of its right to "control" the action. "Party" and "party in interest" as not synonymous. "The phrase, 'real party in interest,' is a term of art utilized in federal law to refer to an actor with substantive rights whose interests may be

represented in litigation by another." U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928, 934–35 (2009). If the United States chooses not to intervene in the action, it is a "party in interest," but not a "party." Accord id. at 935 (holding that, in an FCA action in which the government does not intervene, the United States is not an actual "party" for purposes of the sixty-day time limit for appeal).

The fact that the action was brought "in the name of the government" does not make the United States a party to the action. "A person or entity can be named in the caption of a complaint without necessarily becoming a party to the action." Id.

Thus, if the United States was not a "party" to Skinner's lawsuit, the question becomes whether the government exercised sufficient "practical control" over the litigation that it would be "fair" to bind it to the prior finding. The answer is clearly no. By statute, if the government elects not to intervene, it retains no right to control the litigation in any meaningful way. It may not issues subpoenas, conduct depositions, propound discovery, call witnesses, or cross-examine the defendant's witnesses. It is entitled to receive pleadings and deposition transcripts, but no more. See 31 U.S.C. § 3730(c)(3). In instances in which the government elects not to intervene, it cannot reasonably be argued that the government had a "full and fair opportunity to litigate" the issues. It follows, then, that the government is not bound by a jury's verdict when it elects not to join a False Claim Act action as a party.

To hold otherwise would undercut the system Congress established in the False Claims Act. If the government were bound by private actors prosecuting FCA cases in its name, there would be no purpose to Congress's decision to permit the government to elect to intervene, or to decline to intervene. Under Whyte's proposed interpretation, the government would be forced to be a party regardless of its intervention decision. Whyte's position "would render the

- 6 -

Case 4:12-cr-00021-JLK   Document 53   Filed 12/14/16   Page 6 of 13   Pageid#: 568

intervention provisions of the FCA superfluous, as there would be no reason for the United States to intervene in an action to which it is already a party." Eisenstein, 566 U.S. at 933. This court "cannot disregard that congressional assignment of discretion by designating the United States a 'party' even after it has declined to assume the rights and burdens attendant to full party status." Id. at 934.

Moreover, Whyte's position essentially eviscerates the government's election option—considered and approved by Congress—in the FCA. Under the framework Whyte espouses, the government would have no real choice on election if it has filed or is considering filing criminal charges against an alleged fraudster. As Whyte would have it, the government would be bound to present its case at the whims of the relator, and not upon the government's timetable. It is one thing for relators to take on the role of private attorneys general, see U.S. ex rel. Milam v. Univ. of Tx. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992); that is the system Congress devised. It is quite something else for Defendant to deputize them as private United States Attorneys. That is not something Congress envisioned or approved.

In Eisenstein, the Supreme Court held that the 30-day period for filing a notice of appeal, rather than the extended sixty-day period applicable in actions involving the United States, applied in an FCA action in which the government did not intervene. 556 U.S. at 931. The Court noted that one is not a "party" to an action simply because it is named in the caption; the entity must "intervene" to become a party. Id. at 933. When the United States does not intervene in an FCA action, it is not a "party," but remains a "party in interest." Although the Court held the United States was "not a 'party' to the litigation for purposes of either § 2107 of Federal Rule of Appellate Procedure 4," id. at 937, its analysis applies with equal, if not greater, weight here. As the Supreme Court noted, the fact that the government is entitled to receive

pleadings and deposition transcripts actually cuts *against* the argument that it is a "party" to an FCA action in which it elects not to intervene. "If the United States were a party to every FCA suit, it would already be entitled to such materials under Federal Rule of Civil Procedure 5, thus leaving no need for a separate provision preserving this basic right of litigation for the Government." Id. at 936.

Because the government is not a "party" to an FCA action in which it declines to intervene, and because the government did not exercise "practical control" over Skinner's FCA claim, the doctrine of collateral estoppel is not applicable. The government is not bound by the findings of a jury in which the government was only a "party in interest" with no authority to participate in the action. To hold otherwise would have far-reaching consequences in the FCA context, as well as for "permissive interveners" under Federal Rule of Civil Procedure 24(b).[2]

### B. WARTIME SUSPENSION OF LIMITATIONS ACT

"The Wartime Suspension of Limitations Act (WSLA) suspends the statutes of limitations for 'any offense' involving fraud against the Federal Government. 18 U.S.C. § 3287. Before 2008, this provision was activated only '[w]hen the United States [was] at war.' Id. (2006 ed.) In 2008, however, this provision was made to apply as well whenever Congress had enacted 'a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolutions (50 U.S.C. § 1544(b)).' Id. (2012 ed.)." Kellogg, Brown & Root Services, Inc. v. U.S. ex rel. Carter, 135 S. Ct. 1970, 1974 (2015).

The Act states, in relevant part:

---

[2] Rule 24(b) permits anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Holding the government to the civil jury's conclusion here could be used against permissive interveners in the future. If a potential intervenor "could" have intervened but did not, as the government "could" have intervened in Skinner's action but did not, a future party could argue—as Whyte does here—that a permissive intervener had a "full and fair opportunity to litigate the issue," but chose not to. This is undoubtedly not the system envisioned by Congress or the courts.

> When the United States is at war *or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (40 U.S.C. 1544(b))*, the running of any statutes of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not . . . shall be suspended until *5 years* after the termination of hostilities *as proclaimed by a Presidential proclamation, with notice to Congress*, or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2016) (*italics* reflect 2008 amendments).[3] At issue here is (1) whether the 2008 amendments apply to Whyte's alleged conduct (allegedly committed before the 2008 amendments went into effect, but before the original statutes of limitations on those counts expired), and (2) whether hostilities "ended" more than 5 years prior to the Indictment.

Whyte argues that Counts 4–8 and 10–12 of the Indictment were all completed by June 22, 2007, and thus the general five-year statute of limitations applicable to non-capital federal crimes, see 18 U.S.C. § 3283(a), expired on or before June 22, 2012. Because the Indictment was returned on July 19, 2012, he contends those 8 counts are time-barred. He also contends that hostilities in Iraq were "ended" before that date, and thus the WLSA does not toll the five-year limitations period.

Turning to the first issue—whether the 2008 amendments to the WLSA apply to Whyte's alleged conduct—courts have been uniform in their application of the 2008 amendments to conduct that occurred prior to 2008 but before the original statutes of limitation had run. See, e.g., United States v. Arnold, 991 F. Supp. 2d 1307, 1315 (S.D. Ga. 2014); U.S. v. Anghaie, No.

---

[3] The pre-2008 text read:
> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or an agency thereof in any manner, whether by conspiracy or not . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

1:09-CR-37-SPM/AK, 2011 WL720044, at *2 (N.D. Fla. Feb. 21, 2011); United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 602 (S.D.N.Y. 2013) ("[T]he 2008 WLSA amendment . . . applies to any claims for which the statute of limitations had not yet run at the time of its passage."). Furthermore, it is relatively well-settled that the "application of a statute of limitations extended before the original limitations period has expired does not violate the *Ex Post Facto* Clause." United States v. Grimes, 142 F.3d 1342, 1351 (11th Cir. 1998); see U.S. v. Fraidin, 63 F. Supp. 271, 276 (D. Md. 1945) ("[W]here a statute extends a period of limitations or provides for the tolling thereof, it applies to offenses not barred at the time of the statute's passage."); see also Moody v. Angelone, No. Civ. A. 3:01-cv-83, 2001 WL 34804600, at *2 (E.D. Va. June 18, 2001) (holding that a statute of limitations does not implicate the *Ex Post Facto* Clause).

As for the second issue—whether hostilities[4] in Iraq had "ended" as defined by the WLSA prior to the allegedly criminal conduct—the answer is no. Counts 4–8 and 10–12 concern conduct Whyte concedes occurred between November 8, 2006, and June 22, 2007. Whyte contends that hostilities had "ended" prior to those dates, and because the WSLA "is inapplicable to crimes committed after the date of termination of hostilities," U.S. v. Smith, 242 U.S. 225, 228 (1952), the WLSA did not toll the statute of limitations.

---

[4] Whyte makes a passing argument that the hostilities in Iraq and Afghanistan are not covered by the WLSA, but this argument is misguided. In order for Defendant to succeed on this argument, he requires this Court to ignore those parts of the statute that inconvenience his position. Congress passed two Authorizations for the Use of Military Force ("AUMF"), citing section 5(b) of the War Powers Resolution, and as required by the WLSA, on September 18, 2001, Pub. L. No. 107-40, 115 Stat. 224 (2001) (addressing the War on Terror), and October 16, 2002, Pub. L. No. 107-243, 116 Stat. 1498 (2002) (addressing the war in Iraq). Whyte relies on statements by Sen. Patrick Leahy that "the ongoing conflicts in Iraq and Afghanistan are exempt from its [the WLSA's] requirements." But this Court is bound by the text of the statute and the laws passed by Congress, not Sen. Leahy's opinions on the laws passed by Congress. The WLSA is clear that it is invoked when Congress issues a "specific authorization for the use of the Armed Forces" as contemplated in section 5(b) of the War Powers Resolution. The 2001 and 2002 AUMFs clearly qualify to invoke the WLSA.

Although courts have come down on both sides of this issue, the reasoning of the 11th Circuit Court of Appeals in United States v. Frediani, 790 F.3d 1196 (11th Cir. 2015) is sound and compelling. In that case, as in this one, the defendant argued that hostilities "ended" in Afghanistan with the December 2001 recognition and extension of full diplomatic relations to the newly-formed government of Hamid Karzai, and in Iraq when President George W. Bush stated, on May 1, 2003, that "[m]ajor combat operations in Iraq have ended." See United States v. Prosperi, 573 F. Supp. 2d 436, 455 (D. Mass. 2008). This argument fails because, once again, Whyte ignores that part of the statute that inconveniences his position:[5]

> The plain language of the Act provides that the "termination of hostilities" is determined by "a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." 18 U.S.C. § 3287. It is not "incumbent on [our C]ourt," Prosperi, 573 F. Supp. 2d at 454, to demarcate the end of hostilities. The statute makes clear that the political branches must make that determination. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). Moreover, that requirement of judicial deference to the branches that have the power to declare and wage war makes sense. And [Whyte] has pointed to no concurrent resolution of Congress, nor any Presidential proclamation accompanied by notice to Congress, that the hostilities have terminated under either authorization of military force. A Presidential proclamation must be published in the Federal Register, 44 U.S.C. § 1505(a)(1), as President Truman did in 1946 to mark the end of World War II, see United States v. Grainger, 346 U.S. 235, 246 (1953) (citing 3 C.F.R. § 77–78 (1946 Supp.)) (holding that the tolling of the statute of limitations ends on the date of the Presidential proclamation). No President has issued such a proclamation here.

Frediani, 790 F.3d at 1200–01. Because hostilities had not "ended" on or before the dates of Whyte's alleged criminal activity, the WLSA tolled the limitations periods applicable to those

---

[5] See supra note 4. To be fair to him, however, the Prosperi court did the same thing.

charged crimes. Because the hostilities had not ended on or before July 19, 2007,[6] the charges against Whyte are timely.

The other circuit courts that have addressed the issue of the termination of hostilities (including the Fourth Circuit) agree with the holding in Frediani:

> In United States v. Pfluger, the Fifth Circuit explained that, "[w]hen interpreting a statute, we are bound to follow the plain and unambiguous meaning of the statutory language[, and] . . . the plain and unambiguous language of the [Act] mandates formal requirements for the termination clause to be met." 685 F.3d 481, 485 (5th Cir. 2012) (internal quotation marks and citation omitted). And in United States ex rel. Carter v. Halliburton Co., the Fourth Circuit explained that the Act "specif[ies] that termination shall not occur until the Act's formalities have been met." 710 F.3d 171, 179 (4th Cir. 2013), aff'd in part, rev'd in part sub nom. Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter, — U.S. —, 135 S. Ct. 1970 (2015). Because "[n]either Congress nor the President had met the formal requirements of the Act for terminating the period of suspension," the court concluded that the Act continued to apply. Id.

Frediani, 790 F.3d at 1201. Because the requirements of the WLSA regarding termination of hostilities were not met prior to July 19, 2007, the charges against Whyte are timely.

## IV. CONCLUSION

The unique structure and limits of the False Claims Act prevent the government from participating in *qui tam* actions in which it elects not to intervene. Because the government did not intervene in Skinner's civil False Claims Act action against Whyte, it was not a "party" and did not have a "full and fair opportunity to litigate the issues." The doctrine of collateral estoppel is therefore inapplicable, and the charges against Whyte are not foreclosed by the jury's verdict in U.S. ex. rel. Skinner v. Armet.

---

[6] The Indictment was returned on July 19, 2012; five years prior was July 17, 2007. As long as there had been no "Presidential proclamation, with notice to Congress," or a "concurrent resolution of Congress" terminating the hostilities prior to July 17, 2007, see 18 U.S.C. § 3287, the Indictment is timely (regardless of when or if the hostilities ended after July 17, 2007).

- 12 -

Congress passed two Authorizations for the Use of Military Force that were sufficient to bring the charges against Whyte under the Wartime Suspension of Limitations Act. Because neither the President nor Congress had taken the technical steps to declare the "termination of hostilities" prior to July 19, 2007, the WLSA served to toll the statute of limitations applicable to Counts 4–8 and 10–12 of the Indictment against Whyte. The Indictment, which was filed within five years of July 17, 2007, is therefore proper, and the charges against Whyte are not time-barred.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 14th day of December, 2016.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE