CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
JAN 23 2018
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:12-cr-00021-2 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WILLIAM R. WHYTE, | ) | By: Hon. Jackson L. Kiser |
| | ) |     Senior United States District Judge |
| Defendant. | ) | |

On October 9, 2017, the jury returned its verdict convicting Defendant William R. Whyte of nine counts of fraud and false claims against the United States. He now seeks to set aside that verdict on various grounds. Defendant filed his Motion to Set Aside the Verdict on October 23, 2017 [ECF No. 189], and the United States filed its opposition on December 4 [ECF No. 196]. Defendant sought to strike the government's response in its reply, which he filed on December 9 [ECF No. 201]. I heard oral arguments on Defendant's Motion on December 12. Following a review of the arguments of counsel, the applicable law, and the Record, the matter is now ripe for disposition.

I.    **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

In December 2005, Lt. Col. Jeffery Voss was tasked with preparing a Statement of Work for the procurement of armored vehicles for the transportation of dignitaries in Iraq.[1] As part of his research, he contacted Defendant William Whyte ("Whyte" or "Defendant"), who was the owner and CEO of Armet Armored Vehicles, Inc. ("Armet"). At the time, Armet was a GSA-approved vendor for military contracts. Whyte, on behalf of Armet, provided Lt. Col. Voss with the specifications of the Kestrel, an armored vehicle manufactured by Armet. (See Gov'm Exs. 2 & 4.) Whyte included in the information provided to Lt. Col. Voss information about the

---

[1] Lt. Col. Voss made the request on behalf of the Joint Contracting Command—Iraq ("JCCI").

Kestrel's armoring and ballistic protection. Whyte also informed Voss that Armet would be able to deliver four vehicles a month, depending on the availability of chassis. (See Gov'm Ex. 1.)

Using the information provided by Whyte, Lt. Col. Voss prepared a Statement of Work that more or less conformed to the represented specifications of the Kestrel. That Statement of Work was incorporated into a Solicitation for twenty vehicles, which M. Sgt. Michael Hollon distributed to military contractors on March 6, 2006. (Gov'm Exs. 4B, 5 & 6.) In addition to armoring and ballistic protection requirements, the Solicitation included payment terms and a delivery schedule. Armet responded with a quote, and Whyte was copied on the email to M. Sgt. Hollon. (Gov'm Ex. 10.) Only Whyte had the authority to prepare quotes at Armet. On March 14, 2006, Whyte signed and submitted an Addendum to Armet's quote to account for the change in vehicles soliticited from twenty to twenty-four. (Gov'm Ex. 11.)

In April 2006, M. Sgt. Hollon prepared a second Solicitation that was nearly identical to the first. In it, the JCCI[2] requested eight additional armored vehicles. Armet prepared a second Quote and submitted it to the JCCI. Again, Whyte was included on the email that contained Armet's Quote.

On April 25, 2006, the JCCI awarded the first contract, for twenty-four armored vehicles, to Armet. (Gov'm Ex. 36.) Whyte represented that delivery of the first four vehicles would be on time. (See Gov'm Ex. 37.) A few weeks later, the second contract, for eight additional vehicles, was awarded to Armet. At no point during the contracting process did Whyte or anyone else at Armet indicate that it would be unable to meet the contractual delivery deadline.

Once production commenced, all armoring and ballistics protection decisions were made by Whyte. Evidence adduced at trial showed that, in order to meet the contract's ballistics

---

[2] Defendant rightly notes that the JCCI was the requesting party. He asserts, however, the JCCI was *not* the United States government. For the reasons stated *infra* Part III.C, I reject that argument.

protection requirement, a minimum of two sheets of steel would be required throughout the vehicle. Parts and materials were ordered, and Whyte ordered that all the vehicles be manufactured at Armet's Canadian facility so that he could oversee virtually every aspect of the production. Although not required by the contracts, the military officers who oversaw procurement and enforcement of the contracts testified that they believed production would occur at Armet's U.S. facilities.[3]

The first two vehicles were completed and delivered in August of 2006. Two more vehicles were shipped to Iraq in October of the same year. When the United States was billed for the vehicles, the invoices reflected Armet's Florida address, not its Canadian production facility. (See, e.g., Gov'm Exs. 63 & 64.)

Additionally, once production began, Armet almost immediately requested a progress payment to reimburse it for its expenses in purchasing the materials to complete the contracts.[4] Although Whyte did not personally send the initial request, he was copied on the relevant email. (Gov'm Ex. 45.) The initial request was denied. Two months later, Armet again requested a progress payment. (Gov'm Ex. 65.) That request was also denied. Two months after that, in September 2006, Armet requested a progress payment again. Again, Frank Skinner, Armet's President, copied Whyte on the email and requested that Capt. Tommy Neville, the head contracting officer, meet with Whyte in Iraq to discuss the request. (Gov'm Ex. 76.)

On October 28, 2006, Whyte wrote to Capt. Neville in Iraq and requested the progress payment again. (Gov'm Ex. 77.) In his request, Whyte outlined Armet's production efforts,

---

[3] Whyte's initial communications to Lt. Col. Voss indicated that the designs of the Kestrel were from ARMET Armored Vehicles Canada, Inc. (Gov'm Ex. 4B.)

[4] Progress payments were expressly *excluded* in the contracts. (See, e.g., Gov'm Ex. 18.)

erroneously stating[5] that various vehicles were in stages of production at Armet's U.S.-based facilities, when in fact all vehicles were being manufactured in Canada. Whyte further stated that, without a progress payment, Armet had no hope of completing the contract. (Id. (stating that the contract was a "lost cause" without a progress payment).)

The next month, in November of 2006, Whyte met with Capt. Neville in person in Iraq. In exchange for a $1 million, Whyte offered to deliver the remaining 20 vehicles (on the first contract) within 90 days of receipt of the payment and the eight vehicles (from the second contract) within 120 days of receipt of the funds. (Gov'm Ex. 83.) Whyte followed up again on November 28, 2006, drafting an email for Frank Skinner to send. (Gov'm Exs. 89 & 90.) Lt. Col. Philip Murphy-Sweet, the contracting officer who took over for Capt. Neville, approved the request in December, and Armet was sent nearly $900,000. (Gov'm Ex. 93.)

Despite Whyte's representations, Armet failed to deliver the vehicles within the allotted time. Over the next year, Armet delivered only two additional vehicles. Evidence adduced at trial showed that Armet, at Whyte's direction, prioritized other, higher-paying contracts over the contracts with the JCCI. (See, e.g., Gov'm Ex. 127.) During this time period, Whyte and his employees continued to provide delivery schedules to the JCCI that were not feasible. (See, e.g., Gov'm Exs. 103, 105, 107 & 131.) Whyte signed revised contracts in September 2007, but the JCCI terminated the two contracts with Armet on March 24, 2008. (Gov'm Exs. 132–133, 139, 142–144 & 146.)

At some point during the period when Armet was still under contract with the JCCI, Frank Skinner, Armet's President, became a confidential informant for the FBI. Through Skinner and others, the FBI learned that there were armoring and ballistic deficiencies with the

---

[5] Various Armet employees testified that none of the vehicles from the two contracts with the government were ever manufactured in the United States.

vehicles Armet delivered to Iraq. The FBI pulled the vehicles from the field and tested one at its ballistics facility.

According to J. Buford Boone, a supervisory special agent with the FBI and ballistics expert, testing done on the test vehicles showed that areas of the vehicle—specifically the gunner turret, floor, door hatch, and ceiling—were not armored to the specifications of the contract with the JCCI. (See generally Gov'm Exs. 310, 315, 350–352 & 359.) In fact, the gunner turret, which was supposed to provide protection to the back of the gunner, was fabricated with only one sheet of steel.[6] Every test shot pierced the gunner turret hatch. (Gov'm Exs. 323, 324 & 359.) Thomas Mohnal, a retired FBI agent and explosions expert, testified about the vehicles abilities to withstand explosions from underneath. (See Gov'm Ex. 338.) In his opinion, the vehicles did not meet the contract specifications, owing specifically to the lack of protection around the gear shift[7] and the inoperability of the vehicle following an explosion underneath it. (See generally 332–338 & 342–343.)

Whyte was indicted by a grand jury on July 19, 2012. [ECF No. 1.] Following several pretrial motions, trial commenced on September 25, 2017. At the close of the government case, on October 3, Whyte moved for a judgment of acquittal [ECF No. 153]; I denied the motion at the time [ECF No. 154]. Following the close of all the evidence, Whyte renewed his Rule 29 motion for judgment of acquittal on October 6 [ECF No. 163]; I denied the motion [ECF No. 164]. On October 9, the jury unanimously convicted Whyte on all remaining counts of the Indictment: major fraud (counts 1–3), wire fraud (counts 6–8), and presenting false or fictitious claims to the United States (counts 10–12). (See Jury Verdict, Oct. 9, 2017 [ECF No. 176.]

---

[6] Whyte's designs required two sheets of steel to meet the ballistic protection standard required in the contracts.

[7] When the rubber boot that surrounds the base of the gear shift was removed, the ground was visible. (See, e.g., Gov'm Ex. 361.)

Following the verdict, on October 24, Defendant filed his motion to set aside the verdict pursuant to Rule 29, or to grant a new trial pursuant to Rule 33. [ECF No. 189.] The government filed a response on December 4 [ECF No. 196], and Whyte replied on December 9 [ECF No. 201].[8] I heard oral arguments on the motion on December 12. [ECF No. 204.] Following a review of the arguments of counsel, the Record, and the applicable law, the matter is ripe for disposition.

II. **STANDARD OF REVIEW**

In deciding a motion under Federal Rule of Criminal Procedure 29, the court must consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982). A guilty verdict should be upheld if it is supported by substantial and competent evidence. Glasser v. United States, 315 U.S. 60, 80 (1942). Substantial evidence is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). In determining the issue of substantial evidence, it is not necessary for this court "to be convinced beyond a reasonable doubt of the guilt of the defendant." White v. United States, 279 F.2d 740, 748 (4th Cir. 1960), cert. denied, 364 U.S. 850 (1960). As such, the court may not usurp the jury's exclusive function by weighing evidence, drawing inferences of fact, resolving evidentiary conflicts, or assessing credibility of witnesses. See United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983), cert. denied, 465 U.S. 1028 (1984); see also United States v. Dreitzler, 577 F.2d 539, 545 (9th Cir. 1978). "A defendant bringing a sufficiency challenge

---

[8] In his reply, Defendant moved to strike the government's response as untimely. I denied that motion on the record at the hearing on Defendant's motion to set aside the verdict.

'must overcome a heavy burden.'" United States v. Palomino-Coronado, 805 F.3d 127, 130 (4th Cir. 2015) (quoting United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995)).

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision of whether to grant or deny a motion for a new trial rests within the broad discretion of the court, that "discretion should be exercised sparingly, and a new trial should be granted only when the evidence weighs heavily against the verdict." United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985). Unlike a motion under Rule 29, a court considering a Rule 33 motion "may consider the credibility of witnesses and need not view the evidence in the light most favorable to the government in determining whether to grant a new trial." United States v. Souder, 436 F. App'x 280, 289 (4th Cir. 2011) (unpublished).

### III. DISCUSSION

Defendant seeks a judgment or acquittal or new trial based on five different arguments. First, he claims the evidence was insufficient to support the jury's conclusion that he acted with a specific intent to defraud. Second, he argues that the government failed to disclose potentially exculpatory information pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963). Third, he asserts the indictment was insufficient because the United States was not the victim of any alleged fraud. Fourth, he recycles the previously rejected argument that collateral estoppel and double jeopardy wholly bar his prosecution. Finally, he maintains the government engaged in improper burden shifting during the trial. Each argument is addressed in turn.

#### A. Sufficiency of the Evidence

Defendant first charges that "the government failed to present sufficient evidence that Whyte acted with the specific intent to defraud, an element of all the remaining counts charged

in the Indictment." (Mot. to Set Aside Jury Verdict pg. 4, Oct. 23, 2017 [ECF No. 189] [hereinafter "Mot. to Set Aside"].) He maintains "[t]he government presented no direct evidence of a scheme to defraud or any specific intent by Whyte to defraud the JCCI in the performance of this contract." (Id.) It is well-settled, however, that the specific intent to defraud "may be established by circumstantial evidence and by inferences deduced from facts and situations." United States v. Bales, 813 F.2d 1289, 1294 (4th Cir. 1987). "Fraudulent intent . . . need not be proven by direct evidence." United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993). Accordingly, the government's reliance on circumstantial evidence to prove its case was entirely permissible.

Turning to the circumstantial evidence the government did present, Defendant argues that neither Rick John nor Usman Bashir "offered any credible evidence of intent to defraud by Whyte." (Mot. to Set Aside pg. 5.) Because Defendant is arguing the credibility of the witnesses, I presume this argument is put forward only under Rule 33, as a motion under Rule 29 does not permit the court to weigh the credibility of the witnesses. See United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983). Under the applicable standard of review, Defendant has failed to show that "the evidence weighs heavily against the verdict." United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985).

When considering the testimony of Rick John, Usman Bashir, and Scott Verona, in addition to evidence regarding conversations between Defendant and the military agents (most notably Capt. Tommy Neville), the government established that Defendant actively and purposefully mislead the government about the objective realities of his business, Armet's manufacturing capabilities, and the armoring of the vehicles he delivered. The inference advanced by the government, and reasonably accepted by the jury, was that Defendant *had to*

know, given his micromanagement of every aspect of the design and assembly of the vehicles, that the vehicles were not armored to the specifications of the contract.[9] Despite this knowledge, he asserted or directed others to assert that the Kestrel was armored to a specific level. He likewise *had to* know that Armet was not in a position, financially or otherwise, to meet the government's delivery timetable. Likewise, the various, shifting delivery deadlines Whyte proposed were never feasible. Nevertheless, he repeatedly provided false assurance to the government that his shifting timetables could be met, and he did so directly to Capt. Neville while attempting to secure a nearly $1 million "progress payment" that was not called for under the contract.

Moreover, Defendant's testimony established that he had no intent whatsoever to armor the undercarriage of the vehicles in accordance with the contract, arguing essentially that what the government wanted was not possible. During his testimony, when questioned about the armoring under the vehicle and the ballistic testing that showed the vehicles would not function after an explosion under the vehicle, Defendant testified that it was not possible to armor a vehicle such that it would run after an explosion underneath it, and that he never intended to deliver to the government a vehicle that would run after such an explosion. The government's position at trial was that Defendant established his intent to defraud, as the contract with the JCCI called for the undercarriage to have "mine plating protection to provide the crew the ability to defend against small explosive devices. At a minimum, the protection level acceptable shall withstand blasts underneath the vehicle from, [*sic*] grenades, and/or blasts of whatever nature equivalent to the strength of two DM 51 German ordnance." (Gov'm Ex. 27.) In reviewing the evidence, I concur with the government that Defendant's testimony established that he did not

---

[9] As I made clear to the jury and reiterate here, the question of Defendant's guilt rises and falls on whether the vehicles were armored to the specifications of the contract, not whether the vehicles were sufficiently armored to defeat all threats.

intend to armor the vehicle to "withstand blasts underneath the vehicles" from explosions equivalent to two DM 51 German ordnances.

When considering the evidence as a whole, I conclude that Defendant has failed to meet his burden under Rule 33 and that the "interests of justice" do not require setting aside the jury's verdict.[10]

### B. The *Brady* Issue

"Under Brady and its progeny, a defendant's due process rights are violated if the prosecution fails to disclose evidence that is favorable to the defendant and that is material to guilt or punishment." United States v. McIntyre, Nos. 91-5103 & 91-5104, 1992 WL 154029, at *1 (4th Cir. July 7, 1992) (unpublished) (per curiam) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. Agurs, 427 U.S. 97, 106–07 (1976)). To show that his rights have been violated under Brady, Defendant must demonstrate "(1) that [the] evidence was favorable to the defense, (2) that the evidence was material, and (3) that the prosecution suppressed the evidence." Id. (citing United States v. Warhop, 732 F. 2d 775, 778 (10th Cir. 1984)).

Defendant's argument arises because the government failed to call its main informant, Frank Skinner. As is well documented, Skinner was the government's original and primary informant as it built its case against Defendant. When the government announced at trial that Skinner would not be testifying, the information came as a surprise to both Defendant and the court. In its representations to the court at the time, the government asserted that it could no

---

[10] Although I have not expressly considered this argument under Rule 29, I note that under the applicable standard of review, Defendant has not shown he is entitled to relief. Under Rule 33, the evidence is not viewed in the light most favorable to the government, and the credibility of witnesses may be considered. Under Rule 29, however, the government's witnesses are presumed credible and the evidence is taken in the government's best light. Since the evidence is sufficient to support Defendant's conviction under the Rule 33 standard, it follows that the government prevails under the more deferential Rule 29 standard. Even if that were not so, I make the express determination here that, under Rule 29, Defendant has not made the requisite showing and is not entitled to relief under either Rule 29 or 33.

longer sponsor Skinner's testimony. As a result, Defendant now assumes that, during trial preparations with the government, Skinner must have said something exculpatory about Defendant, or something incriminating as to his own role in the fraud.

At the outset, I cannot say that Defendant is wrong to be suspicious of the government's drastic change in course. During the trial, the government initially failed to comply with this court's order to turn over entire Confidential Human Source files to Defendant, instead turning over a redacted version. Following a second order from this court, the entire file was finally made available to Defendant's counsel during an *in camera* review. Coupled with the government's surprising announcement, mid-trial, that it would not be calling Skinner, I must admit that Defendant's suspicion is not, on its face, unreasonable.

But <u>Brady</u> is not concerned with Defendant's suspicions, however reasonable they may seem in light of the facts. <u>Brady</u> is implicated when *material* evidence is *actually* withheld. "Mere speculation that materials may contain exculpatory evidence is not . . . sufficient to sustain a <u>Brady</u> claim." <u>United States v. Brown</u>, 360 F.3d 828, 833 (8th Cir. 2004); <u>see also</u> <u>United States v. Paulino</u>, No. 95-5961, 1996 WL 671346, at *2 (4th Cir. Nov. 20, 2006) (unpublished) (per curiam) ("Mere speculation that <u>Brady</u> material exists does not justify fishing expeditions in government files."). Like the Seventh Circuit held:

> The major obstacle in the path of [Defendant's] <u>Brady</u> claim is the speculative nature of this contention [that the government's files contain exculpatory evidence]. The <u>Brady</u> analysis assumes the discovery, after trial, of favorable, material information known to the prosecution but unknown to the defense. Yet here [Defendant has] given no indication of the existence of such material information or that the government knows of such information which would likely have change the verdict or created a reasonable doubt that did not otherwise exist. . . . Mere speculation that a government file may contain <u>Brady</u> material is not sufficient to require . . . reversal for a new trial.

United States v. Navarro, 737 F.2d 625, 631 (7th Cir. 1984).

The fatal flaw of Defendant's Brady argument is highlighted in the first line of his brief that addresses this issue: "During the course of the trial, it became apparent that the government *may* have withheld potential exculpatory information obtained from one of the informant witnesses, which was never disclosed to the defense." (Mot. to Set Aside pg. 6 (emphasis added).) Defendant admits he cannot show the government withheld *any* evidence, let alone evidence that was *material*. Without seeing the allegedly undisclosed evidence,[11] I am "unable to conclude that the [evidence was] favorable to the defense, or that there is a reasonable probability that a different verdict would have resulted had the [evidence] been disclosed earlier" or at all. McIntyre, 1992 WL 154029, at *1 (citing United States v. Crowell, 584 F.2d 1020, 1029 (4th Cir. 1978); United States v. Bagley, 473 U.S. 667, 682–83 (1985)). See also Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("[T]he touchstone of materiality [in the Brady context] is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not received a different verdict with the [undisclosed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

### C. United States as the Victim

Likewise, I find no merit in Defendant's contention that the United States was not the victim of Defendant's fraud.[12]

---

[11] Again, I stress that Defendant has presented absolutely *no* evidence that anything was improperly withheld by the government. The most that can be established against the government attorneys is that they were slow to disclose and comply with court orders, not that anything material was actually withheld. Though I certainly take issue with the gamesmanship by the government, there is no evidence of wrongdoing on the part of the government's attorneys.

[12] While Defendant prefers the term "alleged fraud," the jury's verdict takes the fraud from "alleged" to "actual."

Defendant maintains, as he did throughout the trial, that the defrauded party was not the United States, but rather the Joint Contracting Command-Iraq ("JCCI"), a division of the Multi-National Security Transition Command-Iraq ("MNSTC-I"). Defendant pursues this argument despite uncontroverted evidence from virtually every witness that the funds used to pay Defendant's company were U.S. funds. Defendant presented no evidence[13] to counter the government witnesses' testimony that U.S. personnel managed the contracts with Armet and that the funds used to pay for the armored vehicles were U.S. funds.

Agent John Schoeneweis testified directly as to this issue. After reviewing the relevant documents, Agent Schoeneweis was able to identify numerous features, such as leading numbers in the "Accounting and Appropriation DA" box on the relevant forms, which indicated that the funds being disbursed were government funds. (See, e.g., Gov'm Exs. 27, 35, 93.) Additionally, the government established that the funds were paid by the United States Army Corps of Engineers Finance Center. (See Gov'm Ex. 27, Sept. 25, 2017.) Numerous witnesses testified, on the basis of their own personal knowledge, that the requested and disbursed funds were U.S. monies. Finally, it is beyond peradventure that the entire procurement and oversight of these contracts were conducted by U.S. military personnel in the normal course of their duties. The testimony of Lt. Col. Jeffrey Voss, M. Sgt. Michael Hollon, Capt. Kevin Bayless, M. Sgt. Orlando Guerrero, Capt. Thomas Neville, Maj. John Hobart, Maj. Casey Walterscheid, and Capt. Ronald Toler was more than sufficient to carry the day on this point. Lt. Col. Jeffrey Voss also testified that MNSTC-I was a branch of the U.S. armed forces in Iraq, establishing that funds from JCCI, a branch of MNSTC-I, were U.S. funds.

---

[13] I recognize that Defendant was under no obligation to present any evidence. When the government carries its burden to present evidence, however, Defendant is obligated to call that evidence into question in some way. He failed to do so.

Moreover, the legislative record establishes that U.S. monies sent to MNSTC-I were, in fact, U.S. monies. In May of 2005, Congress approved $5,700,000,000 "to be available to the Secretary of Defense . . . for the purpose of allowing the Commander, Multi-National Security Transition Command-Iraq . . . to provide assistance . . . to the security forces of Iraq including the provision of equipment, supplies, services, training, facility and infrastructure repair, renovation, and construction, and funding . . . ." Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005). Although Congress approved the use of the funds for MNSTC-I support, they were and remained U.S. funds.

This conclusion is bolstered by cases such as Erinys Iraq, Ltd. v. United States, 78 Fed. Cl. 518 (2007), Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523 (2011), and Oasis International Waters, Inc. v. United States, No. 10-707C, 2016 WL 10644556 (Fed. Cl. Aug. 31, 2016). In each of these cases, contracts with the JCCI were procured through the federal government procurement statutes. It follows, then, that JCCI is an arm of the U.S. armed forces, since it complies with laws that govern contract procurement with the U.S. government.

The evidence at trial established that the United States was the victim of the fraud.

### D. Collateral Estoppel and Double Jeopardy

I previously addressed Defendant's collateral estoppel and double jeopardy arguments. (See Memorandum Opinion, Jan. 26, 2016 [ECF No. 73].) I continue to believe that ruling was correct.

Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be relitigated again *between the same parties* in any future lawsuit." Ashe v. Swinson, 397 U.S. 436, 443 (1970) (emphasis added); see

also United States v. Fiel, 35 F.3d 997, 1006 (4th Cir. 1994) (holding that whether an issue should be precluded depends on, among other factors, "whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding"). As I held before, the United States is not a party to a False Claims Act ("FCA") case in which it does not exercise its right to intervene. Accord United States ex rel. Eisenstein v. City of New York, 556 U.S. 928, 934–37 (2009). Because the United States was not a "party" to Frank Skinner's FCA action, collateral estoppel did not bar Defendant's criminal prosecution for the same fraud.

### E. Improper Burden Shifting

Finally, Defendant asserts that the government improperly shifted the burden of proof to him at various points during the trial. He makes the argument but fails to cite to any specific statements except AUSA Carlton's statement on October 3 regarding Defendant's ability to call Frank Skinner. At the time, Defendant moved for a mistrial but I denied his request. As a curative measure, I instructed the jury that "[t]he law does not require a Defendant to prove his innocence or produce any evidence at all. The Government has the burden of proving him guilty beyond a reasonable doubt, and if it fails to do so, you must acquit him." (Jury Instruction No. 3A, Oct. 9, 2017 [ECF No. 175].)

To make the showing that the AUSA's comment deprived him of a fair trial, Defendant "must show (1) that the [AUSA's] remarks were improper and (2) that they 'prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (quoting United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)); see also United States v. Rand, 835 F.3d 451, 465 (4th Cir. 2016). There is no doubt that the AUSA's comments were improper, so the issue turns on whether Defendant's rights were prejudicially affected.

The Fourth Circuit has identified several factors to consider when determining whether a prosecutor's improper remark requires a new trial:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of the competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; . . . (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel[;] . . . and (6) whether curative instructions were given to the jury.

United States v. Baptiste, 596 F.3d 214, 226 (4th Cir. 2010). As to the first point, the comment improperly misstated Defendant's obligation under the law (suggesting that he could call a witness despite the fact that he was under no obligation to present any evidence), and wrongfully suggested that Defendant had the burden to prove his innocence. As to the second, the remark was isolated and was not repeated. Third, as discussed above, the evidence was sufficient to sustain the jury's verdict. Fourth, there is no suggestion, and I do not believe, the comments were deliberately made to divert the jury's attention to extraneous matters. In fact, the comment only highlighted a weakness of the government's case—that it was declining to call its main informant. The comments were not invited by the wrongful conduct of defendant counsel, and I gave a curative instruction during the jury charge. Considering all the factors, Defendant has failed to show any prejudice. "There can be no dispute that the prosecutor's remark was improper; [Defendant], however, must still establish prejudice. This [he] cannot do." United States v. Zehrbach, 98 F. App'x 211, 222–23 (4th Cir. May 11, 2004) (per curiam) (unpublished).

Defendant also argues that statements made during closing argument "were intended to suggest that the defendant has some burden to present evidence or call witnesses." (Mot. to Set

Aside pg. 15.) Defendant fails to identify what specific statements he believes were improper, and fails to explain why he did not object to the statements at the time. As such, I am left only with my recollection of the closing argument, and I do not recall any such objectionable statement.

Defendant also appears to maintain that it was error to deny its request for a "missing witness" instruction regarding the government's failure to call Frank Skinner as a witness. Defendant failed to show, at trial or in his post-trial briefings, that Frank Skinner was "missing." "It is well settled that '[t]he rule regarding missing witness instructions is that 'if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable.''" United States v. Brooks, 928 F.2d 1403, 1412 (4th Cir. 1991) (quoting United States v. Rollins, 862 F.2d 1282, 1297 (7th Cir. 1988)). Here, Defendant has failed to offer any evidence—or even the argument—that he was unable to subpoena Frank Skinner. Counsel for the Defendant did proffer that they were able to contact Skinner, but that Skinner was unwilling to speak with him. That was Skinner's right. But Skinner's unwillingness to participate in Defendant's defense is a far cry from being "missing." Because Defendant could have subpoenaed Skinner but failed to do so, a "missing witness" instruction was not permitted. See also United States v. St. Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989) (holding that a "missing witness" instruction is not appropriate where a witness is equally available to both parties).

Additionally, although not asserted by Defendant, Skinner's position as a government informant does not, *ipso facto*, make him "unavailable" to Defendant at trial. In United States v. Spinosa, 982 F.2d 620, 632 (1st Cir. 1992), the First Circuit held that a paid government

informant was "available" to the defense, and that "[t]here is no *per se* rule that paid government informants are presumed to be so clearly favorably disposed to the government that they are not available to criminal defendants." Id. at 633. Accordingly, the "missing witness" instruction was not warranted on the facts presented by Defendant at trial or in his brief.

Any error caused by the government's single misstatement regarding Defendant's obligation to present evidence during a heated argument was appropriately mitigated by the jury instructions. Defendant is not entitled to a verdict of acquittal or a new trial for the government's error. Because Defendant failed to show that a "missing witness" instruction was appropriate, the failure to give one did not prejudice him in any way.

### IV. **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Set Aside the Verdict or for a New Trial will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 23rd day of January, 2018.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE