IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. Action No. 4:12-CR-21 (JLK) |
| ) | |
| ARMET ARMORED VEHICLES, INC., ) | |
| WILLIAM R. WHYTE, ) | |
| ) | |
| Defendants. ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The defendant engaged in deliberate fraud against the United States, endangering the lives of American soldiers and our allies in a war zone. The United States sought armored vehicles sufficient to protect key Iraqi dignitaries, so that the United States could transition its control of a democratic Iraq to the Iraqi people and bring its military men and women home safely. As the defendant admitted at trial, despite his numerous representations to the U.S. military contracting officers to the contrary – and despite the express terms of his contract with the United States -- **he never intended** to sufficiently armor the undercarriage of the dignitary vehicles to protect its occupants from deadly and pervasive roadside bombs or the roofs of the vehicles from overhead enemy gunfire. Instead, the defendant constantly points the fingers at everyone around him, from Frank Skinner, to Rick John, to John Ventimiglia's wife, although the evidence demonstrated that he was the leader of the scheme. The defendant planned and led a dangerous conspiracy. His actions merit a sentence at the highest end of the sentencing guidelines and the payment of full restitution.

As detailed in the Presentence Investigation Report ("PSR"), under the United States Sentencing Guidelines ("the Guidelines"), the defendant's sentencing range is a term of

1

imprisonment of 87 to 108 months, a minimum term of supervised release for one year, and restitution.[1]  PSR, dated Jan. 19, 2018 at ¶¶ 66, 68, 77.  The United States respectfully submits that, based on all of the facts, a sentence at the high-end of the sentencing range is appropriate.  As set forth more fully below, such a sentence would be reasonable and satisfy the § 3553(a) factors, including reflecting the seriousness of the offense.  Contrary to the defendant's arguments, this case is neither "extraordinary" (permitting a departure or variance) nor falls outside the heartland of cases, and thus requires a guideline compliant sentence.

## FACTUAL BACKGROUND

The Court is familiar with the facts of this case as presented at trial, which are detailed in the Court's Memorandum Opinion denying the defendant's post-trial motions in this case, *see* Mem. Op., ECF No. 207, and in the PSR completed by the U.S. Probation Officer.  There are, however, certain key facts that are material to sentencing:

**1.    Whyte was the originator of the fraudulent scheme:**  Whyte was the owner and CEO of Armet Armored Vehicles, Inc.  In December 2005, when Lieutenant Colonel Jeffrey Voss researched armored vehicles, contacting GSA-approved military contractors, LTC Voss communicated with Whyte.  It was Whyte – not Skinner or others – who first provided the United States with false information about the armored vehicles, and it was Whyte who first made misrepresentations regarding his company's ability to deliver the vehicles on a set schedule.  *See* Exhs. 1, 2, 4.  Whyte represented that the Kestrel vehicle had certain ballistics and explosive armoring protections in the ceiling, sides, and floor of the vehicle, Exh. 2 at 5-7, that the vehicles delivered to the United States never had. Whyte blames Skinner for this scheme, but the evidence at trial demonstrated that Whyte was the scheme's creator.

---

[1]    As detailed in Section A(iii) of this Memorandum, the United States believes that the proper sentencing range is 108-135 months' incarceration, and advocates that the Court sentence the defendant to the high-end of that range.

2

**2.     Whyte was leader of the fraudulent scheme:**  While various Armet employees came and went, <u>Whyte</u> remained the constant player.  <u>Whyte</u> was the armoring expert who determined the vehicle design.  *See, e.g.,* Exh. 40, 41, Exh. 43 ("Let me repeat for the floor protection. . . ."); Exh. 50 (attaching "Gurkha floor concept" for review by Whyte).  <u>Whyte</u> approved the Armet quotation submitted to the JCC-I.  <u>Whyte</u> ordered the vehicles manufactured in Canada.  *E.g.*, Exhs. 60, 62B.  <u>Whyte</u> delivered the vehicles to Iraq.  <u>Whyte</u> lied to Captain Thomas Neville to obtain a progress payment.  Exh. 77, 83.  <u>Whyte</u> chose to manufacture vehicles for the Nigerian government ahead of the USA vehicles.  *See, e.g.,* Exhs. 104, 118, 120 ("we are presently supplying Nigeria from there"); 123B (certificate of armor for vehicles to Nigeria signed by Whyte); Exh. 127 (Whyte directing production of other contracts).  When U.S. military contracting officers questioned Whyte about the delivery of the armored vehicles, <u>Whyte</u> provided false delivery schedules or other excuses.  Exhs. 103, 105, 107, 109, 131.

Again, Whyte blames Skinner, but the defective vehicles were made – at Whyte's direction and under his control – at his farm in Canada, away from Skinner.  In fact, Whyte's receipt of the progress payment, his instruction to construct the Nigerian vehicles, and the delivery of the final two USA armored vehicles all occurred after Skinner left the company.  Whyte's manufacture and delivery of the first four vehicles occurred before he hired Rick John or Usman Bashir.

## DISCUSSION

District courts generally must perform the following four steps in sentencing defendants: (1) "properly calculate the sentence range recommended by" the advisory Guidelines; (2) "determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if [it does] not, select a sentence that does serve those factors;" (3) implement any applicable mandatory statutory limitations; and (4) articulate, on the record,

"the reasons for selecting the particular sentence" and especially, if applicable, "explain[] why a sentence outside of the Sentencing Guidelines range better serves the relevant sentencing purposes set forth in § 3553(a)" than one within it. *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); 18 U.S.C. § 3553(a). This memorandum outlines these factors and the bases for the United States' recommended guideline-compliant sentence.

   A. **Section 3553(a) Sentencing Factors**

      i. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

In the "Factual Background" section, the United States detailed the nature and circumstances encompassing the full scope of the defendant's known conduct in this case, as well as evidence that reflects on the defendant's characteristics. Whyte engaged in a potentially catastrophic deadly game – he promised to build vehicles that would protect soldiers and dignitaries from bombs and gunfire and then concealed the lack of proper armoring underneath the vehicle, in the door handles, and on the roof of the vehicles using his expertise in armoring. This is not a typical procurement fraud case and should not be treated as such. As a jury found beyond a reasonable doubt, Whyte risked lives with his behavior. *See* Verdict Form.

In addition, nothing in the defendant's history or characteristics merits a downward departure or variance in this case, nor did the probation officer recommend such a departure in the PSR. PSR ¶¶ 81-82. Although the Court must consider the history and characteristics of the defendant among other sentencing factors, "in order to avoid unwarranted sentencing disparities," a court "should not give them excessive weight." U.S.S.G., Part H, Introductory Commentary (2016 ed.). *See also* Office of General Counsel, U.S. Sentencing Commission, *Departure and Variance Primer* (June 2013) (outlining departure and variance issues). "Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence

4

outside the applicable guideline range but for other reasons, <u>such as in determining the sentence within the applicable guideline range.</u>" U.S.S.G., Part H, Introductory Commentary (emphasis added). To avoid unwarranted sentencing disparities, the guideline range is "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

The Fourth Circuit follows this sentencing policy. "A district court may grant a 'traditional' downward or upward departure if it finds an aggravating or mitigating factor of a kind or a degree that the Sentencing Commission did not consider applicable to the 'heartland' of cases." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (*citing Koon v. United States,* 518 U.S. 81, 92–94 (1996)); *see also* 18 U.S.C. § 3553(b)(1) (noting preference for sentence within the guideline range). "Such departures will generally be based on encouraged factors -- those the Commission recognized the guidelines did not fully take into account -- but departures may also be based on discouraged factors -- those the Commission considered and deemed irrelevant to the determination of most sentences." *Id.* (*citing Koon*, 518 U.S. at 94–95). Departures based on discouraged factors, however, are appropriate only in "exceptional" cases. *Id.*

There are no exceptional circumstances here. The United States recognizes that the defendant has no prior criminal convictions, but this does not excuse his criminal behavior. In fact, the sentencing range reflects his lack of criminal history, and the defendant's criminal history should not be "double factored" by the Court in departing or varying from the applicable sentencing range. The defendant's case is no different than those of the countless other defendants who stand before the court having never been convicted of another offense, and nothing in the PSR demonstrates why this case varies from the heartland of other fraud cases. To the contrary, the defendant's case is notable only in that it is more serious than many fraud offenses committed by first time offenders. While many fraud defendants cause substantial financial harm to their

5

victims, few fraud schemes have the potential for such deadly and destructive consequences.

Moreover, neither the defendant's age nor health should merit a downward departure or variance in this case. Defendant has repeatedly sought special treatment from this Court because of his age and health diagnoses, and his age and health merit no special treatment now. In fact, "[a] downward departure for age is explicitly discouraged." *United States v. Johnson*, 242 F. App'x 7, 11 (4th Cir. 2007) (overturning sentence as unreasonable where court ordered a variance in sentence due to defendant's age). For age to be considered as a mitigating factor under the guidelines, the age must be age must be "present to an unusual degree" and the defendant must be "elderly and infirm." U.S.S.G. § 5H1.1. Departures based on discouraged factors, such as age, are appropriate only in "exceptional" cases, which the defendant has not shown here. *See Hampton*, 441 F.3d at 287. Defendant's testimony and behavior throughout trial, which the Court could observe in person, do not indicate that the defendant is either "elderly" or "infirm," nor has the defendant produced any evidence suggesting a medical or other condition that would warrant any such departure.

In sum, there are no "extraordinary" circumstances in this case meriting a departure or variance from the appropriate sentencing range. The PSR contains no information supporting "extraordinary" offender characteristics, and thus a departure or variance would not be a reasonable sentence. *See United States v. Deigert*, 916 F.2d 916, 919 (4th Cir. 1990) ("To the extent §§ 5H1.1–5H1.6 factors might relate to this case, the Guidelines permit departure when the circumstances are extraordinary."). Whyte's background would not qualify as extraordinary under the law. *See, e.g., United States v. Brand*, 907 F.2d 31, 33 (4th Cir. 1990) (overturning downward departure where basis for departure was not extraordinary; "[defendant's] situation, though unfortunate, is simply not out of the ordinary."); *United States v. Daly*, 883 F.2d 313, 319 (4th Cir.

1989) (downward departure not reasonable; "[Defendant] has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts spousal and parental relationships, and that current criminal behavior can often be partially explained by childhood abuse and neglect.")

Given the circumstances of this case and the history and character of the defendant, a guidelines sentence in this case is entirely appropriate and constitutes a reasonable sentence.

### ii. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence, and Protect the Public

Based on the testimony at trial from Special Agent Thomas Mohnal and Special Agent Buford Boone, there is no doubt that if the defective vehicles had remained in use in the field, soldiers and/or Iraqi dignitaries would have died from gunfire or roadside bombs. As Special Agent Boone's testing video demonstrated, just a few bullets would have killed the turret gunner when he was shot in the back, unprotected from the intentionally insufficient roof armoring. The jury was so appalled by Whyte's behavior, they audibly gasped in horror when watching the video played at trial.

If Whyte had fired into a crowd of people, he would be facing a significant amount of time in prison. His deliberate underarmoring of the vehicles should not be treated any differently. As Whyte's own testimony established, he has refused to accept any responsibility whatsoever for his intentional and criminal conduct. Therefore, a significant sentence of imprisonment is necessary to reflect the seriousness of the offense, provide just punishment, and adequate deterrence to others who choose greed over the lives of others.

### iii. Applicable Sentencing Range and Kinds of Sentences Available

The PSR contains a proposed sentencing range of 87-108 months' incarceration. PSR ¶ 66. The base offense level is 7 (U.S.S.G. § 2B1.1(a)(1)) and the specific offense characteristics

7

increase the base offense level by +18 for the amount of intended loss (U.S.S.G. § 2B1.1(b)(1)); +2 for the sophisticated means by which Whyte accomplished his fraudulent scheme (U.S.S.G.§ 2B1.1(b)(10)); and +2 because the lack of proper armoring could have caused death or serious bodily injury (U.S.S.G. § 2B1.1(b)(15)). *Id.* at ¶¶ 33-36. According to the Probation Office, this makes for a total offense level of 29. *Id.* at ¶ 43. The defendant's criminal history category is I. *Id.* at ¶¶ 44-50. This results in a Zone D sentence of prison only, and makes the defendant ineligible for probation. U.S.S.G. § 5B1.1. In addition, the probation officer has not identified any factors that would warrant a variance or departure from the applicable sentencing guideline range. PSR ¶¶ 81-82.

As detailed in the United States' objection to the PSR, the offense level should be further increased by at least 2 points for the defendant's role in the offense. *See* U.S.S.G. § 3B1.1(c). The facts undisputedly prove that Whyte – the only person to remain throughout the fraudulent scheme – was the leader of the scheme. The Sentencing Guidelines recognized increased criminal responsibly because of Whyte's leadership and managerial actions: he led the scheme, controlled the players, andrecruited his accomplices. Therefore, Whyte's total offense level should be 31, which results in a Zone D sentencing range of 108 to 135 months' incarceration.

With respect to loss, the proper mechanism for calculating loss is, as set forth in the PSR, intended loss of the full contract amount of $6,372,860. As the Guidelines provide, for purposes of § 2B1.1, "loss is the greater of actual loss or intended loss." Cmt. 3(A); *see United States v. Miller*, 316 F.3d 495, 499 (4th Cir. 2003). Here, as the evidence at trial established, Whyte intentionally defrauded the United States by selling intentionally underarmored vehicles. Whyte and his company entered into two contracts to deliver a total of 28 vehicles in exchange for over $6 million. As Whyte admitted on the stand, and as the jury concluded in finding him guilty, he

8

never intended to armor the vehicles to the specifications required by the contracts and, therefore, intended to deliver underarmored vehicles and to cause a loss to the United States of the full contract value of over $6 million, resulting in an 18-level increase, as recommended by the PSR. Even if the "actual" rather than "intended loss" were an appropriate measure, the government lost $ 2,019,454.36 — the amount the United States paid the defendant for six underarmored vehicles and the progress payment.

The defendant's attempts to reduce his loss amount are legally incorrect and wildly speculative and should not be credited by this Court. First, with respect to defendant's argument that Application Note 3(A)(v)(1) should apply, this case is not a "product substitution" case where, for example, a generic product was substituted for a name-brand item. Whyte intentionally provided vehicles that were not usable in that they would not protect the soldiers or Iraqi dignitaries riding inside. Whyte did not provide a "substitute" product in the common sense meaning of the word; he provided vehicles that were, due to their deficiencies, of little to no use to the United States. Even if this were a "product substitution" case, the suggestion that the "loss" for the 6 delivered vehicles would not exceed $6,000 is pure conjecture and supported by no evidence. Notably, nothing in the record indicates the "retrofitting" Whyte suggests would have resolved the crucial problem — the lack of armoring and ballistics protection – <u>or that such retrofitting was even possible</u>. To the contrary, Whyte himself testified that he did not believe he could have actually provided the necessary and contractually required level of protection. Thus, this purported "retrofitting" calculation is irrelevant here.

Moreover, as the "product substitution" note in the Guidelines indicates, loss may include consequential costs to the victim, such as retrofitting the product and the costs of "rectifying the actual or potential disruption to the victim's business operations caused by the product

9

substitution." Of course, there is no evidence to suggest the defendant could or would have rectified the disruption caused to United States military operations in Iraq, and, at this point, quantifying that disruption would be difficult if not entirely impossible. In sum, the defendant's "product substitution" arguments are entirely misplaced, ignore the facts of this case, and lack supporting evidence.

Second, the defendant has not offered any evidence to support his claim that he is entitled to any offset for the "fair market value" of the intentionally underarmored vehicles. The United States paid the defendant in full for six vehicles that lacked ballistics protection and armoring and were thus entirely unusable to the United States. Even assuming the vehicles had some intrinsic value, the United States never recouped any money from the defendant or from selling these vehicles, and thus there was no contemporaneous fair market valuation of these vehicles. Moreover, any attempts to assess the fair market value of these particular vehicles, built over ten years ago, would be impracticable. In sum, defendant's loss argument is inapplicable in this case. The correct loss calculated is intended loss, as contained in the PSR.

      iv.      **Pertinent Policy Statement**

If the Court is considering a downward departure or variance from the sentencing guidelines, the Court must "find[] that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b)(1).

The discussion on the Section 3553(a) factor includes a discussion of the policy and case law concerning defendant's characteristics as an appropriate mitigating circumstance.

In addition, the sentencing guidelines note other circumstances that do not merit a

10

Case 4:12-cr-00021-JLK   Document 217   Filed 02/13/18   Page 10 of 12   Pageid#: 3167

downward departure. Part H of the sentencing guidelines includes a discussion of offender characteristics that are discouraged as a basis for a departure and/or prohibited from use as a departure basis. For example, family ties are not relevant for downward departure (§ 5H1.6), nor is a defendant's role in the offense (§ 5H1.7), nor prior good deeds (§ 5H1.11). *See also* U.S.S.G. § 5K2.0(d) (listing prohibited departures, such as gender, upbringing, and physical condition). Therefore, to the extent the defendant points to general good character, his family, or "good deeds" at sentencing, such evidence does not support a downward departure or variance.

Finally, as detailed elsewhere, Whyte's organization and leadership of the fraudulent scheme should be recognized, as required by the sentencing guidelines, by an increased offense level and corresponding sentencing guideline range.

v. **The Need to Avoid Unwarranted Sentencing Disparities**

A sentence at the high-end of the applicable sentencing range would be consistent with the policy provisions of the Sentencing Guidelines and the case law in this Circuit.

vi. **Restitution**

The defendant is required to pay full restitution to the United States. PSR ¶ 77. The defendant claims to have no real assets, although he has found resources to hire expensive private counsel and to reside in rental home pending trial, hire his own third party custodian and a private investigator from Canada, and pay $250,000 cash into the court as bond. Although the restitution is owed, the United States anticipates that the defendant, once released from prison, will return to Canada without paying any restitution order or completing his supervised release, and has little mechanism to enforce such an order.

vii. **Sentencing Exhibits and Testimony**

As the case was tried before this Court over two weeks, at this time, the United States does

not intend to present additional evidence or testimony to the Court at sentencing. If, however, the defendant seeks to present evidence supporting his contentions with respect to alternative loss calculations under the Guidelines, the United States reserves the right to present additional evidence.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 135 months' incarceration, three years supervised release, and the payment of full restitution for his actions in risking the lives American soldiers and our allies.

Respectfully submitted,

RICK A. MOUNTCASTLE
UNITED STATES ATTORNEY

/s/ *Heather L. Carlton*
Assistant United States Attorney
United States Attorney's Office
255 West Main Street
Charlottesville, Virginia 22902
Tel: (434) 293-4283
Fax: (434) 293-4910
heather.carlton@usdoj.gov

Caitlin R. Cottingham
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20530
Tel: (202) 616-5575
Caitlin.Cottingham@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2018, I electronically transmitted the foregoing document via the Court's ECF system, which provides service on all counsel of record.

/s/ *Heather L. Carlton*
Assistant United States Attorney