IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

UNITED STATES OF AMERICA

        v.                     CASE NO. 4:12-cr-00021-JLK

WILLIAM R. WHYTE

## SENTENCING MEMORANDUM

### I. Introduction

Defendant William Robert Whyte stands convicted on three counts of Major Fraud Against the United States in violation of 18 U.S.C. § 1031, three counts of Wire Fraud in violation of 18 U.S.C. § 1343, and three counts of False Claims in violation of 18 U.S.C. § 287. Mr. Whyte respectfully requests the Court to consider a downward variance to the advisory sentencing guidelines calculated in his Pre-sentence Report ("PSR"). For the reasons discussed in detail below, "the nature and circumstances of the offense and the history and characteristics of the defendant" warrant imposition of a sentence below the applicable advisory Guidelines range, as determined by the Court. *See* 18 U.S.C. § 3553(a)(1).

Currently, the PSR calculates an offense level of 29 and a Criminal History Category of I, providing for an advisory Guidelines range of 87 to 108 months' of incarceration. The defense has filed a number of objections to the PSR, including several that affect the calculation of the appropriate offense level for Mr. Whyte. Based on these objections, Mr. Whyte contends that the maximum offense level could be 21, but the offense level and ultimate sentence should be even lower. The applicable Guidelines range for an offense level of 21 and a criminal history category of I is a term of imprisonment of 37 to 46 months. The nature and circumstances of the offense and the specific characteristics of this defendant also support consideration of a

downward variance from the applicable advisory Guidelines range ultimately calculated by the Court.

## II. Defendant's History and Characteristics

Mr. Whyte was born in the United Kingdom in 1945, and has resided in Ontario, Canada since 1968. After attending military school in Scotland and residing in Kenya, Mr. Whyte joined the British Army at 19 years of age. He served in the British Army for four years, obtaining the rank of Sergeant. During his time of service, Mr. Whyte was assigned to duty on the East German front during the height of the Cold War and later was reassigned to conduct training exercises with Canadian and U.S. forces at Camp Gagetown in New Brunswick, Canada. While at Camp Gagetown in 1967, Mr. Whyte was exposed to toxic and carcinogenic chemical substances by the U.S. Army, including Agent Orange, Agent Purple, and Agent White.[1] As many former military members know, exposure to these dangerous chemicals leads to a variety of chronic medical conditions as well as debilitating birth defects. Indeed, as a result of exposure to these chemicals, Mr. Whyte has lost two children to severe birth defects, and his youngest daughter suffers from Multiple Sclerosis. After his service in the military, Mr. Whyte continued his public service by serving as a Toronto police officer and as an officer in the York Regional Police. In total, Mr. Whyte has served the British Commonwealth as a soldier or police officer for over two decades.

After retiring from public service, Mr. Whyte became the owner and Chief Executive Officer of Armet Armored Vehicles, Inc., a U.S. company ("Armet"), and played a key role in the Canadian operation of Armet Armored Vehicles Canada, Inc. ("Armet Canada"). Both

---

[1] National Defence and the Canadian Armed Forces, Reports and Publications, *The Use of Herbicides at CFB Gagetown from 1952 to Present Day*, (finding that "For three days in June 1966 and four days in June 1967, Agent Orange, Agent Purple and other unregistered herbicides were tested at Canadian Forces Base (CFB) Gagetown in cooperation with the U.S. military to evaluate their effectiveness."), available at http://www.forces.gc.ca/en/about-reports-pubs/herbicides-gagetown.page (last accessed February 15, 2018).

Armet and Armet Canada produced armored vehicles for police and military purposes, as well as civilian uses such as currency and personnel transport.

Mr. Whyte has been married twice and has four surviving children. He has two sons by a previous marriage, Robert Whyte, age 45, and James Whyte, age 38. Mr. Whyte has two daughters with his current wife, Sharman Fullerton. His daughter Alexandra Whyte is 28 years old and just passed her bar exams in Canada. Mr. Whyte's youngest child, Caroline Whyte, is 25 years old and recently became a trainee teacher at Le Cordon Bleu Ottawa Culinary Arts Institute. Caroline has been diagnosed with Multiple Sclerosis, which requires ongoing treatment and medical intervention. In her attached letter, Caroline describes her father as "the best man I have ever and will ever know," as a man that "has always instilled in my siblings and myself a deep appreciation for the law," and describes "how lucky I am to have had such an amazing father to look up to."[2]

Numerous other family friends, ex-military brothers, and business associates universally describe a man that is "a very caring and trustworthy friend,"[3] "one of the most trustworthy, honest and decent person [sic] I have known,"[4] and "a scrupulously honest, hard working, innovative, dedicated and thoroughly reliable friend."[5] One longtime friend stated that "[a]s a fellow countryman and ex UK Military, it goes against the very essence of our mentality to defraud anyone, let alone the US Government … I do not believe that Bill Whyte ever set out to defraud the US Government."[6] A former Armet Danville employee, Kim Ayers, described Mr. Whyte as "one of those rare individuals who trusts unconditionally" and "[h]is faith in his

---

[2] Letter from Caroline Whyte. All letters cited, as well as others, are attached as **Exhibit A**.
[3] Letter from Barrister and Solicitor Janette Mills and her husband Dr. Martyn Hyde, Professor Emeritus of Medicine, University of Toronto.
[4] Letter from Bruce J. Powley, former Toronto and York Regional Police Officer.
[5] Letter from Steven A. Robinson, President/CEO of Seaborne International and former Sergeant in the Royal Corps of Transport stationed with Mr. Whyte in Thailand in 1968.
[6] *Id.*

employees was impressive." She recounts that "[h]e often lent money, and made sure that our families were cared for."[7] Each of the attached letters confirms the character and history of Mr. Whyte and mitigate against a lengthy sentence in this case.

Mr. Whyte also suffers from a number of serious medical conditions, including atrial fibrillation, recurring seizures, prostate cancer, and post-traumatic stress disorder. Mr. Whyte was diagnosed with prostate cancer in June of 2017. He has had four mini-strokes and one major stroke in the past seven years. On December 29, 2017, Mr. Whyte suffered a mini-stroke while incarcerated awaiting sentencing on this matter and had to be rushed to Roanoke Memorial Hospital for treatment.

Despite his exposure to various carcinogenic chemicals, as well as the difficulties associated with losing two children as a result, Mr. Whyte has lived a good, long life free of criminal activity. Indeed, Mr. Whyte, as one would expect from a former British solider and Canadian police officer, has no criminal history and has never run afoul of the law. The PSR is devoid of information under the topics of "Juvenile Adjudications," "Adult Criminal Convictions," "Other Criminal Conduct," "Pending Charges," and "Other Arrests." *See* PSR, paras. 46-50. After extradition to face trial, Mr. Whyte remained a model citizen, and was placed on supervised release for many months prior to trial. Mr. Whyte has also been a model probationer and had no issues with his supervision. Indeed, there is no reason to doubt that Mr. Whyte, if so permitted, would comply with any conditions this Court imposes as part of sentencing.

### III. Calculation of Loss

As noted in his PSR objections, intended loss is the wrong measure of loss in this case because it overstates the harm and does not fit the facts. This is not a case where a victim was

---
[7] Email from Kim Ayers, former Armet Danville employee.

defrauded out of money and never received value for that money. This is not a case where the defendant intended to commit a fraud that fell short of its intended goals. Rather, this case is about a product that fell short of contract requirements. Under Application Note 3 to U.S.S.G. § 2B1.1, "intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict." The facts of this case do not indicate that Mr. Whyte or Armet intended to defraud the JCCI out of the total amount of the contracts. The terms of the contracts conditioned payment upon an inspection and acceptance by the JCCI in Iraq. Intended loss should not even come into play because (1) the vehicles have value; (2) the government inspected the vehicles upon delivery; and; (3) no payment for a vehicle could be made until after inspection and delivery. Armet provided six vehicles that substantially complied with the contract specifications. Therefore, intended loss is the wrong measure of loss in this case, and an actual loss determination provides the only rational basis for any loss enhancement.

Therefore, the appropriate measure of loss is actual loss, or "the reasonably foreseeable pecuniary harm that resulted from the offense" is the appropriate measure of loss. This case most closely aligns to a "Product Substitution" case, which the Fourth Circuit describes as a case "in which the product sold is something other than what it is claimed to be." *United States v. Chatterji*, 46 F.3d 1336, 1341 (4th Cir. 1995). Similarly, Application Note 3(A)(v)(1) to U.S.S.G. §2B1.1 provides:

> "In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of ***retrofitting the product so that it can be used for its intended purpose***, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution." (Emphasis added).

The evidence adduced at trial, standing alone, supports application of the product substitution measure of loss, which consists of the cost of retrofitting the product. At trial, it was established by numerous witnesses (e.g., Whyte, Verona, John, Bashir, Boone) that steel was missing from the six vehicles delivered. That steel could have been retrofitted for each vehicle at a minimal cost, less than $1,000 per vehicle delivered with labor, as illustrated by DX-17 and the testimony of Mr. Whyte, which confirmed the *de minimus* cost of retrofitting the missing parts that would ensure the vehicles met contract specifications for blast and ballistic protection.[8] Likewise, witnesses Rick John, Usman Bashir, and William Whyte testified that Armet shipped the required run-flat tires, which the JCCI ultimately failed to inventory and put on the vehicles. John testified that he performed Ford-required suspension upgrades, and Neville confirmed that Armet re-designed and delivered new turrets, at no charge to the government. Mr. Whyte also set up repair facilities at Sky Link Arabia at the Baghdad International Airport and incurred substantial costs to perform maintenance and any retrofits. Mr. Whyte also procured insurance from Lloyd's of London to warrant the workmanship and function of the design of the Gurkha; since the JCCI never informed Mr. Whyte of any defects charged in the indictment, he never had the opportunity to remedy the problems. *See* DX-63. Therefore, the appropriate measure of loss for the six delivered vehicles should not exceed $4,000.00 and must take into consideration the substantial efforts Mr. Whyte undertook to remedy any defects or problems with the vehicles.

Furthermore, as noted above and at trial, Mr. Whyte made significant efforts to satisfy Armet's obligations to repay the progress payment of $824,531. Armet's Canadian lawyer, Leo Klug, responded on February 14, 2008, to the JCCI's "Show Cause" letter issued on February

---

[8] DX-17 indicates that the cost of materials related to replacing missing steel for each vehicle would have been as follows: (1) K300350 Lock Overlap, 10 additional pieces @ $8.36 equals $83.60; (2) K017 Roof Panel, 1 additional piece @ $580.82; (3) excess materials for 4x4 mechanism. The total cost per vehicle could be reasonably estimated at $664.42.

11, 2008. *See* DX-20. On March 9, 2008, Mr. Whyte sent a letter captioned "Unilateral cancellation of contract" to the JCCI regarding Armet's two contracts with the JCCI. In that letter, Mr. Whyte offered to provide three Gurkha vehicles to the JCCI in Baghdad for no charge as an offset to the progress payment Armet received in late 2006. The value of the three Gurkha vehicles was noted by Mr. Whyte in his letter as $589,849.77. Mr. Whyte's letter continued, "This then leaves a deficiency owed to DOD for the original advance in the amount of $234,150.23. In this regard, please advise us where this refund is to be sent." *See* DX-21. At trial, Capt. Ron Toler of the JCCI advised that no one ever responded to Mr. Whyte's offer and the JCCI never engaged Mr. Whyte, Armet, or Mr. Klug in negotiations to resolve their contractual dispute. Capt. Toler's March 24, 2008 letter from the JCCI also noted the reason for termination was based on Mr. Whyte's "letter to this agency on 9 Mar 2008 requesting the unilateral cancellation of this contract." *See* GX-143.

Mr. Whyte's reasonable offer was met largely with silence and, as most business do when in a contractual dispute, Armet heeded the advice it had been given by its attorney in Canada that the JCCI would initiate legal proceedings to determine the respective duties and obligations between the parties. The JCCI, likely due to the ongoing criminal investigation that Mr. Whyte was unaware of, opted not to file suit against him individually or Armet and never sought to negotiate or litigate any amounts due. Mr. Whyte's efforts, as well as the JCCI's lack of effort, establish that not only did Mr. Whyte never intend to defraud the government of these funds, he instead actively sought to repay what was due after the relationship devolved beyond repair. Any accurate loss calculation should take into account these important facts and the fact that whenever Mr. Whyte learned of an issue with a vehicle (e.g., the lack of run-flat tires, Ford suspension problems, turret slewing ring problems), he spent time and money to fix it.

7
Case 4:12-cr-00021-JLK   Document 218   Filed 02/15/18   Page 7 of 13   Pageid#: 3176
20663/1/8325128v1

Accordingly, any loss figure that contemplates inclusion of the $824,531 progress payment, must also take into consideration the costly efforts made by Mr. Whyte that are otherwise unaccounted for.

Similar to the guidance offered in the U.S.S.G. regarding Product Substitution Cases, the Guidelines also provide in Application Note 3(E) to §2B1.1 that loss shall be reduced by the value of the vehicles provided to the government, offsetting the figure of $2,019,454.36 by the value of the vehicles provided. Guidelines calculations of loss allow for the offsetting of such losses by applying credits against the loss figure for money returned, and *the fair market value of the property returned and the services rendered*, by the defendant to the victim before the offense was detected. U.S.S.G § 2B1.1, App. Note 3(E)(i).

Case law in the Fourth Circuit, as well as other Circuits, reveals how courts have applied these standards for loss calculation and offset loss values by the value of goods and services provided by the defendant. "[L]oss amount shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected." *United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017) (citing § 2B1.1 cmt. n.3(E)(i)). The amount of money unlawfully received, e.g., the illegal profit, is an adequate measure of actual loss under § 2F1.1. *See United States v. Castner*, 50 F.3d 1267, 1276 (4th Cir. 1995) (citing *United States v. West*, 2 F.3d 66, 71(4th Cir. 1993) (amount of money unlawfully taken indicates loss under § 2F1.1 when "the government simply did not get what it paid for")).

Case law further defines what types of costs may be considered for calculation of loss in product substitution and procurement cases. This portion of the commentary also provides that, "in the case of fraud affecting a defense contract award, loss includes the reasonably foreseeable
8

administrative cost to the government and other participants of repeating or *correcting the procurement action affected*, plus any increased cost to procure the product or service involved that was reasonably foreseeable." *United States v. Powell*, 58 Fed. App'x 991, 994 (4th Cir. 2003) (unpublished) (emphasis added).

A loss calculation including the $824,531 progress payment plus the value of the parts missing and/or cost to repair and retrofit the vehicles would represent the outer limits of any maximum total loss to the government. And, as discussed above, the progress payment should not be wholesale included in the loss amount under 2B1.1 either. Instead, the cost to replace missing parts to each vehicle, estimated to be roughly $665 per vehicle, should define the lower limit of any actual loss amount. At a minimum, then, a finding of actual loss in this case should only enhance Mr. Whyte's calculation by 2 points (more than $6,500 but less than $15,000), and at a maximum, should result in a 14-level increase (more than $550,000 but less than $1.5 million). For these reasons, the Court should only apply a maximum of a 14 level enhancement to the base offense level for the total actual loss as a result of these contracts and a just and fair sentence would include a much lesser loss enhancement.

### IV. Sentencing Scheme

Since the Guidelines became advisory, the determination of a just sentence is not confined to details of the crime itself and criminal history. While the Guidelines serve as a backdrop and starting point for determining any criminal sentence, the Court is advised to look at the history and characteristics of the defendant apart from the crime; to establish general deterrence; to protect society from this particular defendant; and rehabilitation. 18 U.S.C. §3553(a)(1) & (2). As indicated by the foregoing history and characteristics of Mr. Whyte, there are ample grounds for a downward variance in this case.

There are several specific factors that support the imposition of a downward departure or variance in favor of Mr. Whyte. The Guidelines recognize that age and physical condition may be relevant factors for the Court to weigh in determining whether a departure is warranted. In the case of an infirm defendant or one with advanced age, these factors may be a reason to depart downward where these characteristics are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines. *See* U.S.S.G. §§ 5H1.1 and 5H1.4.[9]

As noted in Part C of the PSR (Offender Characteristics), Mr. Whyte is nearly 73 years old. He currently suffers from a number of serious medical conditions, including atrial fibrillation, seizures, prostate cancer, and post-traumatic stress disorder. Mr. Whyte was diagnosed with prostate cancer in June of 2017 and continues to deal with the symptoms and effects of this ongoing condition. Mr. Whyte has a history of recurrent strokes and most recently suffered a mini-stroke in December of 2017 while incarcerated awaiting sentencing on this matter. He has had four mini-strokes and one major stroke in the past seven years. Mr. Whyte's advanced age and documented history of serious ongoing medical conditions warrant a sentence below the advisory Guidelines range.

Additionally, Mr. Whyte's lack of any criminal history and service in the British Army and as a Canadian police officer further support consideration of a downward variance. During his service in the British Army and while in Canada assisting the United States with training for the Vietnam War, Mr. Whyte was exposed by the United States to the hazardous and

---

[9] While the government points to *U.S. v. Johnson*, 242 F. App'x 7, 11 (4th Cir. 2007) for the proposition that a variance based on age is *per se* "unreasonable," the Court said no such thing. Instead, the Court pointed out that "the 144-month sentence in this case is procedurally unreasonable … [f]irst, the district judge **relied on an incorrect calculation of the Guideline range**." *Id.* at 10. And "[s]econd, the district judge imposed a variance sentence without first considering the possibility of a conventional downward departure under the Guidelines." *Id.* at 11. While recognizing that a "downward departure for age is explicitly discouraged, although not altogether precluded" the Court did not make a finding about whether age was an appropriate grounds for a downward departure. *Id.* To claim that a variance based on age is "unreasonable" is not supported by *Johnson* or the Guidelines. Note also that *Johnson* is an unpublished case, information which is not provided in the government's citation either.

carcinogenic substances Agents Orange, Purple, and White. Mr. Whyte's exposure to Agents Orange, Purple, and White has contributed to his serious medical conditions and to disabilities and birth defects that have affected his children, including two children that were severely disabled and died prematurely due to birth defects.

When it became apparent that Armet was not capable of completing the contracts under the current circumstances, Mr. Whyte attempted to settle the contracts and offered to complete the two additional vehicles that the company had parts for and to repay the balance of $234,150.23 for work unable to be completed. Mr. Whyte, through counsel, asked to unilaterally cancel the contracts and offered this settlement by letter prior to any cancellation attempt by contracting officers. His offer was met with silence and remained unanswered at the time that contracting officers sought to cancel the contracts. The evidence presented at trial and before this Court for sentencing reveals attempts by Mr. Whyte to rectify and correct issues with the vehicles as they were brought to his attention, including the shipment to Iraq of replacement run-flat tires when it was discovered that the tires originally installed did not function properly as run-flat tires. The costs associated with replacing these tires and shipping them overseas, as well as the costs of maintaining repair facilities with Skylink Arabia[10] and the Baghdad International Airport were paid by Armet. The Court should consider these attempts by Mr. Whyte to repair the vehicles and to offer repayment of the unused portion of the progress payment, as they illustrate not only a lack of the requisite criminal intent to defraud but also amount to efforts inconsistent with causing actual or any intended loss.

The combination of these factors that support consideration of a downward variance weigh in favor of the Court applying a downward variance from the applicable Guideline range.

---

[10] *See* Letter from William Maizlin, Founder and President of Conquest Vehicles, Inc., attached as **Exhibit B.**

11

Case 4:12-cr-00021-JLK   Document 218   Filed 02/15/18   Page 11 of 13   Pageid#: 3180
20663/1/8325128v1

## V. Conclusion

Mr. Whyte's history and characteristics weigh heavily in favor of the likelihood that he will not engage in any further criminal activity. He does not, and will not, pose a danger to others and is no longer engaged in the business and industry that was the subject of the instant investigation and prosecution. His age and physical condition are factors that the Guidelines recognize as potential grounds for a downward variance from the applicable Guidelines range. In accordance with the reasons stated above, the Defendant moves the Court for a downward variance and for a reasonable and fair sentence taking into account all of the foregoing information and such additional information as will be presented at Mr. Whyte's sentencing hearing.

Respectfully submitted,

/s/ Justin M. Lugar
      By Counsel

Justin M. Lugar, Esq.
Thomas J. Bondurant, Jr. Esq.
Jennifer S. DeGraw , Esq.
Gentry Locke LLP
10 Franklin Road, SE
Post Office Box 40013
Roanoke, Virginia  24022
Tele:  (540) 983-9389
Fax:   (540) 983-9400
jlugar@gentrylocke.com
Virginia State Bar # 77007
bondurant@gentrylocke.com
Virginia State Bar #18894
District of Columbia Bar #995991
degraw@gentrylocke.com
Virginia State Bar # 89962
North Carolina State Bar # 38125

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record, on this 15th day of February, 2018.

/s/ Justin M. Lugar